IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge William J. Martínez**

Civil Action No. 22-cv-1141-WJM-JPO

MELISSA GAMBOA, on her own behalf and on behalf of all others similarly situated,

     Plaintiff,

v.

KISS NUTRACEUTICALS,
KISS INDUSTRIES, LLC,
COLE EVANS, and
GRANT DEAN,

     Defendants.

---

## ORDER GRANTING RENEWED MOTION FOR CLASS CERTIFICATION

---

Before the Court is Plaintiff Melissa Gamboa's ("Plaintiff") Renewed Motion for Class Certification (ECF No. 116) ("Motion"), on her own behalf and on behalf of all others similarly situated. Defendants KISS Nutraceuticals ("KISS"), KISS Industries, LLC, Cole Evans, and Grant Dean (collectively, "Defendants") filed a response (ECF No. 118),[1] to which Plaintiff filed a reply (ECF No. 124). For the following reasons, the Motion is granted.

## I. BACKGROUND[2]

Plaintiff brings this wage action on behalf of herself and others similarly situated

---

[1] Although Defendants now proceed *pro se*, they were represented by counsel when they filed their response. (*See* ECF Nos. 130, 132 (defense counsel's subsequent withdrawal from representation of all Defendants).)

[2] This background is derived from the parties' briefs and Plaintiff's Amended Complaint

pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"); the
Colorado Minimum Wage Act, C.R.S. § 8-6-101 *et seq.* ("CMWA"), as implemented by
the Colorado Overtime and Minimum Pay Standards Order, 7 C.C.R. 1103-1
("COMPS"); the Denver Minimum Wage Ordinance, D.R.M.C. Ch. 58, § 58-16, *et seq.*
("DMWO"); and the Colorado Wage Claim Act, C.R.S. § 8-4-101, *et seq.* ("CWCA").
(ECF No. 88 at ¶¶ 3–6.)  She asserts that Defendants improperly classified her and the
putative class members as independent contractors and, as a result, unlawfully denied
them overtime wages.  (ECF No. 116 at 1.)

KISS manufactures "vitamin supplements and [cannabidiol] ['CBD'] gummies at
its facility in Denver, Colorado,"[3] where Plaintiff worked between February 2020 and
April 2022.  (ECF No. 118 at 2–3.)  Plaintiff alleges that she and the putative class
members were "low-wage assembly line workers employed in Defendants' cannabidiol
('CBD') gummy manufacturing operation" in Denver.  (ECF No. 116 at 1.)  As described
by Plaintiff, KISS's workforce was "unskilled, largely immigrant and female . . . ."  (*Id.* at
2.)  They "performed rote, manual, . . . labor" (*id.* at 6), including "basic [] tasks" like
"arranging gummy bears on trays, placing drops of CBD oil on the gummy bears, and
packing them for shipment" (*id.* at 2).  In exchange for this work, Plaintiff and the
putative class members were paid hourly wages at rates set by Defendants.  (*Id.* at 2,
8.)  It appears undisputed that Defendants classified all of their hourly workers as

_____

(ECF No. 88).  All citations to docketed materials are to the page number in the CM/ECF
header, which sometimes differs from a document's internal pagination.

[3] The Amended Complaint alleges Evans and Dean are "owner[s] and manager[s] of the
Kiss Nutraceuticals enterprise."  (ECF No. 88 at ¶¶ 14–15; *see also* ECF No. 118-1 (Evans
Decl.) at ¶ 2 (stating he is the "founder and current CEO of Kiss Nutraceuticals").)

independent contractors and that none were paid overtime wages.  (*Id.* at 1–2; ECF No. 118-1 (Evans Decl.) at ¶ 5.)  Defendants assert they "generally engage[] independent contractors on a per order basis to provide services related to KISS's inventory, administration, and production for the limited purpose of filling a particular order."  (ECF No. 118 at 2–3.)

In August 2023, the Court certified an FLSA collective action consisting of "[a]ll hourly employees who worked on or after May 9, 2019 who were not paid overtime wages for overtime hours worked."  (ECF No. 52.)  Defendants state that no one opted in to the FLSA collective action during the subsequent notice period, which concluded in November 2023, although four individuals joined the litigation prior to the collective action's conditional certification ("Opt-In Plaintiffs").  (ECF No. 118 at 3.)

Plaintiff now seeks to certify a Rule 23 class as to her wage claims arising under state and local law with the following definition: "All production, inventory and shipping workers who worked overtime hours and who were not paid overtime wages between May 9, 2019 and the present."  (ECF No. 116 at 10.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23 sets forth the requirements for maintaining a class action.  "The party seeking certification must demonstrate the proposed class satisfies all the requirements of Rule 23(a) and one of the three alternatives provided by Rule 23(b)."  *Black v. Occidental Petroleum Corp.,* 69 F.4th 1161, 1173 (10th Cir. 2023) (citing Fed. R. Civ. P. 23(a)–(b)).  The four Rule 23(a) requirements are (1) numerosity, meaning "the class is so numerous that joinder of all members is impracticable;" (2) commonality, such that "there are questions of law or fact common to the class;" (3)

typicality, meaning "the claims or defenses of the representative parties are typical of the claims or defenses of the class;" and (4) adequacy, such that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Plaintiff moves for certification under Rule 23(b)(3), which requires "the court find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are commonly referred to as predominance and superiority, respectively.

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011). Accordingly, "[t]he district court must undertake a rigorous analysis to satisfy itself that a putative class meets the applicable Rule 23 requirements." *Menocal v. GEO Corp., Inc.,* 882 F.3d 905, 913 (10th Cir. 2018) (internal quotation marks omitted). Usually, "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-More Stores,* 654 U.S. at 351. Still, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013).

## III. ANALYSIS

### A.    Rule 23(a) Numerosity & Ascertainability

Rule 23(a)(1) requires a class be "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiff approximates that there are 180 members in the putative class.  (ECF No. 116 at 10.).  The Court agrees that a class comprised of 180 members is sufficient to satisfy the numerosity element.  *See Green v. Perry's Restaurants LTD,* 2024 WL 5159138, at *10 (D. Colo. Sept. 18, 2024) (numerosity "easily satisfied" where plaintiffs identified 130 putative class members); *Torres-Vallejo v. Creativexteriors, Inc.,* 220 F. Supp. 3d 1074, 1081 (D. Colo. 2016) (allegation of approximately 140 class members satisfied numerosity requirement).

Even assuming the class is sufficiently numerous, however, Defendants maintain that it is not ascertainable.  (ECF No. 118 at 9.)  The Tenth Circuit "treat[s] ascertainability as a sub-requirement of numerosity" because, "[t]o show numerosity, 'there must be presented some evidence of established, *ascertainable* numbers constituting the class in order to satisfy even the most liberal interpretation of the numerosity requirement.'"  *Evans v. Brigham Young Univ.,* 2023 WL 3262012, at *5 (10th Cir. May 5, 2023) (quoting *Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432, 436 (10th Cir. 1978)) (emphasis added in original); *see also Harrison v. Envision Mgmt. Holding, Inc. v. Bd. of Directors,* 2025 WL 295009, at *4–5 (D. Colo. Jan. 24, 2025) (analyzing ascertainability as a sub-requirement of numerosity).

The Tenth Circuit has not adopted a standard for ascertainability, but it "allow[s] district courts to consider [out-of-circuit standards] as part of their discretion to grant or deny class certification."  *Evans,* 2023 WL 3262012, at *8.  Most often cited are those

standards adopted by the Third and Seventh Circuits.  *See id.*  "The Third Circuit uses a stringent two-element test for ascertainability, requiring that (1) the class be objectively defined, and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"  *Id.* (quoting *Hayes v. Wal-Mart Stores, Inc.,* 725 F.3d 349, 353 (3d Cir. 2013) (citation omitted)).  "The Seventh Circuit declined to adopt this exact test but similarly requires that a plaintiff show ascertainability by 'defining classes clearly and with objective criteria.'"  *Evans,* 2023 WL 3262012, at *8 (quoting *Mullins v. Direct Digit., LLC,* 795 F.3d 654, 672 (7th Cir. 2015)).

Here, Defendants argue the proposed class is not ascertainable because (1) the payroll records on which Plaintiff relies to identify the putative class members likely contain inaccurate information, leaving no "administratively feasible mechanism" to identify the class (ECF No. 118 at 13); and (2) as defined, the proposed class is an "impermissible fail-safe" (*id*. at 4).[4]  The Court ultimately finds neither issue renders the class unascertainable.

1.    Inaccurate Payroll Records

Plaintiff asserts "[t]he putative class is easily ascertainable" and "manageable on a class basis in the practical sense" because "[t]he parties have access to complete records of all hours worked and all overtime wages unpaid for each member of the

---

[4] Although Defendants do not label it as such (ECF No. 118 at 4–6), the Court views this issue as bearing on the ascertainability of the proposed class.  *See Braver v. Northstar Alarm Servs., LLC,* 329 F.R.D. 320, 335 (W.D. Okla. 2018) (considering whether "ascertainability concerns are raised because the class is an improperly defined 'fail safe' class"); *Banks v. Central Refrigerated Servs., Inc.,* 2017 WL 1683056, at *5 (D. Utah May 2, 2017) (considering defendant's argument that the proposed class definition was a fail-safe in analyzing whether the class was ascertainable).

putative class." (ECF No. 116 at 5.) Thus, she explains, identifying the class members is a "simple function of math": since it is undisputed that Defendants (1) classified *all* of their workers as independent contractors (ECF No. 116-5 (KISS Rule 30(b)(6) Dep.) at 82:18–83:10), and (2) did not pay overtime premiums to *any* worker (*id.* at 64:1–17), all that is needed is to review Defendants' weekly payroll records from the relevant time period to determine which workers have more than 40 hours in any given workweek. (ECF No. 116 at 5; ECF No. 124 at 3–4.)

Defendants assert, however, that Plaintiff's method "presumes that the identifying information these individuals provided to KISS was true and accurate." (ECF No. 118 at 13.) They express doubt as to whether that is the case based on Gamboa's deposition testimony that she provided a false name to KISS upon hiring, which is also the name that appears on her new-hire paperwork and, presumably also, KISS's payroll records. (ECF No. 118-2 (Gamboa Dep.) at 9:12–15.) Defendants thus argue "[i]t is reasonable to infer that other contractors may have also supplied false names and identifying information." (ECF No. 118 at 13.) Indeed, "beyond a lack of interest," Defendants surmise that is "the only logical explanation for the lack of opt-ins," given "the same wage and hour records" were used to distribute the collective action notices. (*Id.*)

The Court is unpersuaded. As a threshold matter, ascertainability does not require "the identity of individual class members . . . be ascertained before class certification." MANUAL FOR COMPLEX LITIGATION § 21.222 (4th ed. 2004). Rather, "[a]scertainability requires that '[t]he *method* of determining whether someone is in the class must be administratively feasible' and must not depend on 'individualized fact-finding or mini-trials*." Donaca v. Dish Network, LLC,* 303 F.R.D. 390, 397 (D. Colo.

2014) (quoting *Carrera v. Bayer Corp.,* 727 F.3d 300, 307 (3d Cir. 2013)) (emphasis

added).  Thus, "[a]n identifiable class exists if its members can be ascertained by

reference to objective criteria."  MANUAL FOR COMPLEX LITIGATION § 21.222 (4th ed.

2004).  That standard is generally met where "the class members are identifiable using

a defendant's records."  *In re HomeAdvisor, Inc. Litig.,* 345 F.R.D. 208, 220 (D. Colo.

2024); *see also Wornicki v. Brokerpriceopinion.com, Inc.,* 2016 WL 11697044, at *8 (D.

Colo. Sept. 20, 2016) (identification of class of "tens of thousands" of brokers seeking

"compensation for unpaid work" was administratively feasible through defendants'

accounting records).

     A single, known instance of the use a false name does not show that reliance on

KISS's payroll records to identify the putative class will require "individualized fact-

finding or mini-trials."  *Carrera,* 727 F.3d at 307. [5]   And Defendants' suggestion that the

use of false names among their workers was widespread otherwise appears to be

unsubstantiated.  Notably, the Court previously reopened Phase I discovery at

Defendants' behest so they could propound further document requests to Plaintiff on,

among other topics, "the ascertainability of potential class members."  (ECF No. 115.)

Defendants asserted then that the additional discovery was necessary because they

had "recently discover[ed] that many KISS workers provided false names, making their

identities and current locations unknowable."  (ECF No. 114 at 5.)  Yet, apart from

---

[5] Nor can Defendants reasonably argue it is infeasible to identify the payroll records
pertaining to Gamboa's hours worked, since she has testified on the record as to the name she
supplied to KISS at hiring.  (ECF No. 118-2 (Gamboa Dep.) at 9:12–15.)  Moreover, Plaintiff
appends a letter dated "3/24/20–4/10/20" identifying "Melissa Gamboa Serrano" as an essential
worker needed to report to work during the COVID shutdown, which is *signed by Evans*.  (ECF
No. 124-5.)  Evans's testimony that he had no knowledge of a "Melissa Gamboa" ever having
worked for KISS thus lacks credulity.  (ECF No. 118-1 (Evans Decl,) at ¶¶ 6–7.)

Gamboa, Defendants are apparently still unable to point to any other instance of a worker having used an alias or false identity.

On the other hand, Plaintiff points out that the same KISS records elicited a roughly one-third participation rate for an in-person event in January 2024 (the "January 2024 Event"), which suggests that, at a minimum, accurate contact information for the putative class members is substantially available.  *See also Mullins,* 795 F.3d at 665 (noting Rule 23 "does not insist on actual notice to all class members in all cases" and "recognizes it might be *impossible* to identify some class members for purposes of actual notice").  To the extent a class member's "real identity" may later need to be reconciled with a name appearing on KISS's payroll records, the Court sees little reason why that inquiry could not be undertaken post-certification.  "Defendants will have . . . opportunities to individually challenge the claims of absent members if and when they file a claim for damages."  *Briseno v. ConAgra Foods, Inc.,* 844 F.3d 1121, 1131 (9th Cir. 2017); *Kellman v. Spokeo, Inc.,* 2024 WL 2788418 (N.D. Cal. May 29, 2024) (where identification of class members was based on "teaser profiles" on defendant's website and defendant expressed "concern that some teaser profiles have inaccurate, fake, or nonresidential addresses," citing *Briseno* to support that class membership could "be established by affidavit").  Indeed, "parties have long relied on 'claims administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court' to validate claims."  *Briseno,* 844 F.3d at 1131 (quoting *Mullins,* 795 F.3d at 667).

In sum, the Court is satisfied that, here, identification of the putative class members can be straightforwardly accomplished by reference to KISS's payroll records.

At this stage, Defendants' arguments to the contrary are merely speculative and, at worst, remediable through efforts which the Court has no reason to believe will be so onerous as to render identification of the class administratively infeasible.

  2. <u>Fail-Safe Class Definition</u>

  As noted, Plaintiff proposes the following class definition: "All production, inventory and shipping workers who worked overtime hours and who were not paid overtime wages between May 9, 2019 and the present."  (ECF No. 116 at 10.)  Defendants argue this definition creates an impermissible "fail-safe class."  (ECF No. 118 at 4.)  The Court, again, disagrees.

  "A class definition creates a fail-safe class when the class definition bases membership in the class on the validity of the plaintiff's claims."  *Simmons v. Isle of Capri Black Hawk LLC,* 2021 WL 5513744, at *6 n.3 (D. Colo. Feb. 23, 2021) (quoting Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification,* 81 Fordham L. Rev. 2769, 2782 (2013)); *see also Stallbaumer v. NextEra Energy Resources, LLC,* 2023 WL 3496245, at *10 (D. Kan. May 17, 2023) ("A fail-safe class is one in which determining membership turns on the merits of the individual class members' claims.") (internal citations omitted).  Fail safe classes are potentially problematic for two reasons.  "First, if the only members of fail-safe classes are those who have viable claims on the merits, then class members either win or, by virtue of losing, are defined out of the class, escaping the bars of res judicata and collateral estoppel."  *Stallbaumer,* 2023 WL 3496245, at *10 (quoting *In re White,* 64 F.4th 302, 313 (D.C. Cir. 2023)).  Second, a fail-safe class definition makes it "difficult—if not impossible—to determine class membership early on in the case" because the court

must "conduct an individual inquiry regarding the merits of each proposed plaintiff's claim . . . ."  *Stallbaumer,* 2023 WL 3496245, at *10 (quoting *Mike v. Safeco Ins. Co. of Am.,* 223 F.R.D. 50, 53 (D. Conn. 2004)).  "Not only does this complicate identifying and certifying a class, but it creates significant issues in even managing the case as a class action."  *Stallbaumer,* 2023 WL 3496245, at *10; *see also Orduno v. Pietrzak,* 932 F.3d 710, 716–17 (8th Cir. 2019) ("A fail-safe class is also unmanageable . . . because the court cannot know to whom notice should be sent.").

Defendants argue Plaintiff's proposed class definition is an impermissible fail-safe because, insofar as membership "depends on whether individuals 'worked overtime hours and . . . were not paid overtime wages,'" it assumes those individuals "were entitled to overtime wages as non-exempt employees."  (ECF No. 118 at 5.)  Put differently, given that "the crux of this litigation" is Defendants' contention that the potential class members were "allegedly not paid overtime [] because they were classified as independent contractors, not employees," Defendants assert the definition "presupposes Defendants' liability for misclassification."  (*Id.* at 5–6.)

The Court sees it differently.  Irrespective of whether Plaintiff and the proposed class members were independent contractors or employees—that is, irrespective of whether Defendants are liable for misclassifying Plaintiff and the proposed class members—the seemingly undisputed fact remains that they were not compensated for overtime hours.  In other words, the Court does not read the putative class members' legal *entitlement* to overtime wages to be a condition of their membership in the class.

Other federal courts have concluded similarly.  For example, in *Perry v. Krieger Beard Services, LLC,* the Southern District of Ohio considered whether an FLSA

collective action defined to include "all technicians who worked for [defendant] and were not paid one-and-a-half times their regular rate of pay for all hours worked in excess of 40 per workweek and/or the minimum wage for each hour worked" created an impermissible fail-safe class.  2018 WL 3218413, at *3 (S.D. Ohio July 2, 2018).  The court concluded the proposed collective was not a fail-safe because "[t]he facts that define an individual as a class member are knowable without any determination of liability."  *Id.*  That is, "[a] technician who worked over 40 hours in a week and was not paid overtime or the equivalent of minimum wage is in the class regardless of whether or not the technician qualifies as an employee or is entitled to such compensation under the FLSA."  *Id.*  That is precisely the case here.  *See also Cummins v. Ascellon Corp.,* 2020 WL 6544822, at *8 (D. Md. Nov. 6, 2020) (in case where surveyors' entitlement to overtime wages was contested, FLSA collective action defined to include surveyors who "were not paid overtime compensation for hours over forty in one or more workweeks" was not an impermissible fail-safe).[6]

The Court thus finds the class is appropriately defined and does not create an impermissible fail-safe.[7]

_____

[6] By way of illustration, Plaintiff's proposed class definition *would* constitute an impermissible fail-safe if it were defined in terms of the putative class members' alleged misclassification.  *See, e.g., Fillipo v. Anthem Companies, Inc.,* 2022 WL 18024818, at *2 (S.D. Ind. Dec. 30, 2022) (Plaintiffs could not "straight out define the collective as those '*misclassified* by Defendant' . . . because that would create an impermissible fail-safe class"); *Luviano v. Multi Cable, Inc.,* 2017 WL 3017195, at *4, 11–12 (C.D. Cal. Jan. 3, 2017) (revising class definition to exclude fail-safe language defining class as "[a]ll ITs paid as faux 'independent contractors' during the [relevant] period . . . [when] the ITs were paid as independent contractors rather than employees"); *Adams v. Wenco Ashland, Inc.,* 2020 WL 2615514, at *8 (N.D. Ohio May 22, 2020) (striking final clause defining FLSA collective action as those "who were misclassified as exempt employees").

[7] Defendants correctly point out "[t]here is a circuit-split over whether a fail-safe class

For all these reasons, the Court finds Plaintiff has satisfied Rule 23's numerosity and ascertainability requisites to class certification.

**B.      Rule 23(a) Commonality**

Next, a plaintiff must show "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "[T]o satisfy the commonality requirement of Rule 23(a)(2), the class's claims 'must depend upon a common contention' that 'must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Brayman v. KeyPoint Gov't Sols., Inc.,* 83 F.4th 823, 837 (10th Cir. 2023) (quoting *Wal-Mart Stores,* 564 U.S. at 350).  "In other words, the focus of Rule 23(a)(2)'s commonality requirement is not so much on whether there exist common *questions*, but rather on 'the capacity of a class wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'"  *Naylor Farms, Inc. v. Chaparral Energy, LLC,* 923 F.3d 779, 789 (10th Cir. 2019) (quoting *Wal-Mart Stores,* 564 U.S. at 350).  "The existence of a single common question is sufficient to meet the commonality requirement."  *Brayman,* 83 F.4th at 837; *Menocal,* 882 F.3d at

definition independently bars class certification, which the Tenth Circuit has not yet addressed," (ECF No. 118 at 5 (citing *Sherman v. Trinity Teen Sols., Inc.,* 84 F.4th 1182, 1191 n.6 (10th Cir. 2023) (collecting cases))).  Nonetheless, the Court believes that a straightforward revision to Plaintiff's proposed class definition would have been the most appropriate remedy here, even had it found the proposed class definition to create an impermissible fail-safe.  (*See* ECF No. 124 at 3 n.2 (proposing alternate language).)  *See Messner v. Northshore Univ. HealthSys.,* 669 F.3d 802, 825 (7th Cir. 2012) ("Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science.  Either problem can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis." (collecting cases)); *Luviano,* 2017 WL 3017195, at *11–12; *Adams,* 2020 WL 2615514, at *8.  But because the proposed definition does not create an impermissible fail-safe, no revision of the class definition is necessary here.  *Cf. Cummins,* 2020 WL 6544822, at *8 n.6.

914 ("A finding of commonality requires only a single question of law or fact common to the entire class.").  In wage cases like this, "the commonality analysis considers 'whether the challenged policy is common to the class as a whole, and whether the proposed class members share similar job duties.'"  *Pruess v. Presbyterian Health Plan, Inc.,* 745 F. Supp. 3d 1218, 1236 (D.N.M. 2024) (quoting *Felps v. Mewbourne Oil Co., Inc.,* 336 F.R.D. 664, 670–71 (D.N.M. 2020) (citation omitted)).

Here, Plaintiff challenges Defendants' "class-wide classification of its workers as independent contractors."  (ECF No. 116 at 11.)  "Misclassification cases involving a policy categorically applied to the entire class typically present a common question because the central question of whether employees were wrongfully classified as exempt from overtime pay requirements unites them."  *Golden v. Quality Life Servs., LLC* 2023 WL 3182645, at *6 (D.N.M. Apr. 30, 2023).  Plaintiff has shown—and Defendants do not dispute—that KISS classified all of the putative class members as independent contractors.  (*E.g.,* ECF No. 124-1 (KISS Rule 30(b)(6) Dep.) at 115:5–12.)  Whether Defendants did so lawfully is thus a question common to the class.  *See McAlister v. LGI Homes Corp., LLC,* 2024 WL 5431464, at *6 (D. Colo. Dec. 6, 2024) (commonality satisfied where "overtime claim appears to turn entirely on whether [defendant] properly exempted its sales representatives as exempt from overtime pay under Colorado law"); *Pruess,* 745 F. Supp. 3d at 1236 (commonality met "because they have shown that [Care Coordinators] were subject to the same classification policy that resulted in their alleged" nonpayment for overtime wages, and collecting additional cases; *Huddleston v. John Christner Trucking, LLC,* 2020 WL 489181, at *8 (N.D. Okla. Jan. 30, 2020) ("Here, whether or not [defendant] misclassified the California Work

Class as independent contractors is a common question.").

Nonetheless, Defendants argue "a blanket exemption policy 'does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties.'" *Levine v. Vitamin Cottage Nat. Foods Markets, Inc.,* 2023 WL 3648684, at *14 (D. Colo. May. 25, 2023) (quoting *Marlo v. United Parcel Serv., Inc.,* 639 F.3d 942, 948 (9th Cir. 2011) (citation omitted)).  And, here, the proposed class definition appears to identify three different categories of KISS workers—that is, "production, inventory, and shipping workers."  (ECF No. 116 at 10.)  Despite their separate identification in the proposed class definition, Plaintiff's briefing does not distinguish between them—a lack of explanation the Court also finds confusing.  (*See generally* ECF No. 116, 124.)

Still, the Court gathers from Defendants' briefing and the parties' supporting documentation that "production, inventory, and shipping" refer to departments within KISS's Denver plant.  (*See, e.g.,* ECF No. 118 at 8 (referring to "inventory and production departments").)  Evans states in his declaration that KISS "does not generally assign independent contractors to specific departments or assign independent contractors specific responsibilities."  (ECF No. 118-1 (Evans Decl.) at ¶ 16.)  Thus, on this record it appears to the Court that "production, inventory, and shipping" refer not to the putative class members' job titles, but to potentially fluid assignments along KISS's assembly line.  (*See also* ECF No. 116 at 8 (asserting "Defendants directed their employees as to where along the assembly line they were to work" and "placed each worker in a position on the line according to which job Defendants wanted the worker to do each day").)

This is consistent with Plaintiff's theory that *all* of the putative class members were non-managerial, hourly plant workers whose job duties directly related to the manufacture of Defendants' CBD gummy bear products.  (ECF No. 116-5 (KISS Rule 30(b)(6) Dep.) at 111:22–112:1 ("Q: . . . The work that the hourly employees perform is really the essence of your business.  And what I mean is they are creating the products that you sell, correct? / A: That would be correct, yes.").)  Collectively, they "performed rote, manual, assembly line labor" for KISS, including "basic assembly line tasks," like "arranging gummy bears on trays, placing drops of CBD oil on the gummy bears, and packing them for shipment."  (ECF No. 116 at 1–2, 6–7; *see also* ECF No. 116-1 (Soto Dep.) at 33:8-13 (testifying that she "arranged the gummies on trays and count[ed] the gummies" at times, "dropped some CBD oil on the gummies" at times, and "pack[ed] the gummies into bottles" at still other times); ECF No. 116-3 (Gamboa Dep.) at 22:10-17 (testifying that, upon hiring, supervisor told her she would be "fixing the gummies," "packing them," "weighing them," "cleaning them," etc.).)

The evidence also supports Plaintiff's theory that none of the work performed by the putative class members required specialized skills, training, or education.  (ECF No. 116-5 (KISS Rule 30(b)(6) Dep.) at 111:3–21 (testifying the hourly workers are not required to have any certifications, specialized skills, or prior experience); ECF No. 116-1 (Soto Dep.) at 12:16–23 (testifying she has a high school diploma but no certifications); ECF No. 116-2 (Lara Dep.) at 10:20–11:5 (testifying she never graduated from high school); *id.* at 356:20–22 (testifying she had never done assembly-line work prior to working at KISS).)  Plaintiff asserts that all of KISS's hourly workers received the same basic training, which appears to have been more concerned with personal

hygiene practices than job-specific tasks.  (*See generally* ECF No. 116-11).  To the

extent the putative class members received any additional on-the-job training, their

testimony supports the notion that it was both informal and minimal.  (ECF No. 116-2

(Lara Dep.) 22:23–23 (learned how to do assembly line work by watching other workers

arrange gummies); ECF No. 116-1 (Soto Dep.) at 35:17–36:15 (testifying job training

could last only a few minutes).)

　　　While Defendants generally argue their "classification policy may have accurately

classified some independent contractors and misclassified others," they do not even

attempt to describe any difference—let alone any material difference—in the job duties

of "inventory, production, and shipping workers," nor explain why such differences might

require disparate outcomes in the independent contractor versus employee analysis.

(ECF No. 118 at 7 (quoting *Levine,* 2023 WL 3648684, at *15).)  The Court is mindful

that Plaintiff carries the ultimate burden to show Rule 23's requirements are satisfied,

but Defendants' failure to refute her arguments further suggests that any such

differences are immaterial insofar as Rule 23 is concerned.  Importantly, commonality

does not, in any case, "require Plaintiff[] to show 'that class members perform identical

duties—an impossible task.'"  *Pruess,* 745 F. Supp. 3d at 1236 (quoting *Jacob v. Duane

Reade, Inc.,* 289 F.R.D. 408, 415 (S.D.N.Y. 2013) (internal quotation omitted)).  "Rather

the Plaintiffs' job duties must be 'largely consistent.'"  *Pruess,* 745 F. Supp. 3d at 1236

(quoting *Rodriguez v. Peak Pressure Control, L.L.C.,* 2020 WL 3000415, at *7 (D.N.M.

June 4, 2020)).  Plaintiff has demonstrated as much here.

　　　Should later evidence reveal meaningful distinctions between "inventory,

production, and shipping workers" that defeat commonality, Defendants are free to seek

leave to file an appropriate motion addressing that issue.  *See* Fed. R. Civ. P.

23(c)(1)(C) ("An order that grants or denies class certification may be altered or

amended before final judgment."); *see also In re Integra Realty Res., Inc.,* 354 F.3d

1246, 1261 (10th Cir. 2004) ("[A] trial court overseeing a class action retains the ability

to monitor the appropriateness of class certification throughout the proceedings and to

modify or decertify a class at any time before final judgment.").  On the evidence

presented, however, the Court finds the commonality prerequisite is satisfied as to the

proposed class.

**C.    Rule 23(a) Typicality**

Rule 23(a) also requires that "the claims or defenses of the representative parties

are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  "Like

commonality, typicality 'do[es] not require that every member of the class share a fact

situation identical to that of the named plaintiff.'"  *Sherman v. Trinity Teen Sols., Inc.,* 84

F.4th 1182, 1193 (10th Cir. 2023) (quoting *Colo. Cross Disability Coal. v. Abercrombie*

*& Fitch Co.,* 765 F.3d 1205, 1216 (10th Cir. 2014)).  Rather, "[t]ypicality requires only

that the claims of the class representative and class members are based on the same

legal or remedial theory."  *Sherman,* 84 F.4th at 1193 (quoting *Menocal,* 882 F.3d at

924 (internal quotation marks omitted)); *see also Adamson v. Bowen,* 855 F.2d 668,

676 (10th Cir. 1988) ("[D]iffering fact situations of class members do not defeat typicality

under Rule 23(a)(3) so long as the claims of the class representative and class

members are based on the same legal or remedial theory.").

Plaintiff asserts that her claims are typical of the class because she "seek[s] to

represent a class of workers who were misclassified as independent contractors, just as

she was, and who were not paid overtime wages, just as she was."  (ECF No. 116 at
11.)  The Court agrees.  *See Gomez v. Epic Landscape Prods., L.C.,* 2024 WL
4605146, at *13 (D. Kan. Oct. 29, 2024) (finding typicality satisfied where "all members
of each class share the same legal theory—they were not paid overtime wages despite
Defendants' obligation to pay those wages"); *Golden,* 2023 WL 8112714, at *5 (finding
typicality satisfied "by demonstrating the putative class worked over 40 hours a week
and was denied overtime pay like the named Plaintiffs"); *Rodriguez,* 2020 WL 3000415,
at *8 (typicality requirement met where "[t]he claim of all the class members, including
[the class representative] share[d] the same theory: that Defendants failed to pay them
overtime for hours worked in excess of forty hours per week . . . because Defendants
misclassified them as exempt").

Defendants' only opposition to typicality is that Plaintiff has not shown that
"shipping workers'" claims are typical of her own, on similar grounds to those already
addressed by the Court above with respect to commonality.  (ECF No. 118 at 9.)  The
Court will not address those points for a second time here.

The Court thus finds Rule 23(a)'s typicality requirement is satisfied.

**D.    Rule 23(a) Adequacy**

The final prong of Rule 23(a) requires Plaintiff to demonstrate "the representative
parties will fairly and adequately protect the interest of the class."  Fed. R. Civ. P.
23(a)(4).  The Tenth Circuit has identified two questions relevant to this inquiry: "(1) do
the named plaintiffs and their counsel have any conflicts of interest with other class
members[,] and (2) will the named plaintiffs and their counsel prosecute the action
vigorously on behalf of the class?"  *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d

1180, 1187–88 (10th Cir. 2002) (citation omitted); *In re HomeAdvisor, Inc. Litig.,* 345
F.R.D. at 225 (same).

The Court will reserve its discussion as to the adequacy of proposed class
counsel for that portion of its Order addressing the appointment of counsel pursuant to
Rule 23(g)(4).  However, the Court now addresses—and rejects—the three reasons
Defendants argue make Gamboa an inadequate class representative.  (ECF No. 118 at
14.)

1. <u>Credibility</u>

Defendants first assert that Gamboa "lacks credibility" based on three admissions
she purportedly made at her deposition.  (*Id.*)

Before turning to the cited testimony, the Court observes that "[w]hether a
proposed class representative is honest and credible may have some bearing on the
representative's ability to adequately represent absent class members."  *Chester v.
Tancorde Finance, Inc.,* 2015 WL 5090323, at *5 (D.N.M. Jan. 12, 2015).  Still, courts
rarely permit challenges based on "the contention that a proposed representative is
inadequate because of prior unrelated unsavory, unethical, or even illegal conduct."
1 Newberg and Rubenstein on Class Actions § 3:68 (6th ed. 2022) ("Newberg and
Rubenstein").  Rather, the personal characteristics must generally bear some relevance
to the litigation, such as when "the proposed representative ha[s] given inconsistent
testimony on material issues in the litigation in a way that might jeopardize his credibility
with the fact finder at trial."  *Id.*  As Judge Nottingham of this District once put it in an oft-
cited case,

few plaintiffs come to court with halos above their heads;
fewer still escape with those halos untarnished.  For an

> assault on the class representative's credibility to succeed,
> the party mounting the assault must demonstrate that there
> exists admissible evidence so severely undermining
> plaintiff's credibility that a fact finder might reasonably focus
> on plaintiff's credibility, to the detriment of the absent class
> members' claims.  It is not necessary that [the court] resolve
> issues of credibility against the class representative.
> Decertification is appropriate if unique and substantial issues
> of credibility cling to the class representative, thereby
> creating a potential adverse impact on the class.

*Dubin v. Miller,* 132 F.R.D. 269, 272 (D. Colo. 1990).

Turning to the challenged testimony here, Defendants argue Gamboa's credibility is undermined by her admissions that (1) "she reported false working hours on more than one occasion;" (2) "she restricted KISS's access to internal inventory records as a way to leverage payment of final paychecks she claims were owed;" and (3) "she provided a false name when she began providing services to KISS."  (ECF No. 118 at 14 (internal citations omitted).)

Defendants' characterization of the first "admission" plainly appears to be an overstatement.  At the cited portion of her deposition, Gamboa responded affirmatively when asked if she had "ever report[ed] more hours worked on [her] time sheet than [she] actually worked."  (ECF No. 118-2 (Gamboa Dep.) at 77:3–5.)  However, she elaborated that her supervisors[8] "would tell us to add some extra hours when we have to wait for a truck . . . [b]ecause sometimes they arrive 3:00, 4:00, in the morning, and I have to go to receive the truck."  (*Id.* at 77:6–12.)  On such occasions, Gamboa would

---

[8] Defendants at times refer to their workers with apparent supervisory authority as "co-contractors" of Gamboa and the putative class members rather than "supervisors."  (*See, e.g.,* ECF No. 118 at 7 ("Ms. Gamboa admitted that she herself reported more hours on her timesheet than she had actually under the suggestion of other KISS contractors (*i.e.,* potential class members).").)

"go back home" before returning to work again "at 6:00 in the morning," so a supervisor "would tell [her], You can add an hour . . . ."  (*Id.* at 77:12–17.)  Defendants' suggestion that it was dishonest of Gamboa to add an hour to her timecard in these circumstances borders on the absurd and warrants no further discussion.

As to the second and third admissions, Gamboa readily testified at deposition that (1) she provided KISS with an alias when she began her working relationship with the company (*id.* at 9:12–15), and (2) when KISS withheld two of her paychecks after her resignation from the company, she restricted her supervisors' access to a spreadsheet she created and maintained relating to certain company inventory in an effort to leverage payment (*id.* at 84:3–85:20).  As a general matter, these issues appear to have little, if any, relevance to "material issues in the litigation."  Newberg and Rubenstein § 3.68.  Moreover, Gamboa testified candidly about each at deposition, such that the Court has little concern she will provide "inconsistent testimony" at trial. *Id.*

Further, as a pertinent policy consideration, it cannot be ignored that Gamboa's immigration status at the commencement of her working relationship with KISS was unclear—a factor surely motivating her decision to use an alias.  Similar to the FLSA, the Court discerns no language in Colorado's wage laws conditioning relief on immigration status.  Given this, "lack of legal immigration status cannot be a bar to recovery, or indeed named plaintiff status, as several courts have held."  *Montoya v. S.C.C.P. Painting Contractors, Inc.,* 530 F. Supp. 2d 746, 751 (D. Md. 2008) (casting doubt on relevance of use of false name on the adequacy of class representative).

Relatedly, to the extent Gamboa's withholding of an inventory spreadsheet

following her resignation from KISS bears on her credibility, it is mitigated by two

factors.  First, as Defendants recognize, she did so in response to KISS's *own* alleged

inequitable conduct in withholding her final wages.  Second, the spreadsheet to which

she restricted her supervisors' access was housed within her "personal email" that she

"create[d] to facilitate [her] own work" and would "share with [her supervisors],"

seemingly on her own initiative.  (ECF No. 118-2 (Gamboa Dep.) at 85:7–25 ("Nobody

asked them to do them.").)  In other words, this does not appear to have been an

instance of Gamboa having misappropriated highly confidential internal documents

containing proprietary trade secrets or the like.

In sum, the Court finds that Gamboa's testimony on these topics does not

undermine, let alone severely undermine, her credibility so as to adversely impact the

absent class members in a manner addressed by Rule 23(a)'s adequacy requirement.

*See Dubin,* 132 F.R.D. at 272.

2.    Knowledge of "Shipping Workers"

Defendants argue Gamboa is an inadequate class representative because she

"purports to represent 'shipping workers' in the proposed class but, by her own

admission, is not even aware of a 'shipping department' within KISS, does not know

anything about these purported individuals, and failed to identify them at all in her

Motion."  (ECF No. 118 at 14.)

Even assuming Defendants' characterization of Gamboa's deposition testimony

is accurate, "Rule 23(a)(4) does not require a detailed knowledge of the class's claims."

*Foster v. Apache Corp.,* 285 F.R.D. 632, 645 (W.D. Okla. 2012).  "Instead, the class

representative need only demonstrate a basic understanding of the class claims as well

as an understanding of his or her duties as the class representative and a willingness to fulfill those duties." *Id.; see also Lerner v. Haimsohn,* 126 F.R.D. 64, 67 (D. Colo. 1989) ("Generally, as long as the plaintiffs, as class representatives, know something about the case, even though they are not knowledgeable of the complaint's specific allegations, the class should be certified.").

Defendants cite the Court to no case law, and the Court does not interpret relevant authority to require Plaintiff to have knowledge of the particular factual circumstances of the absent class members' claims. Defendants have otherwise given the Court little reason to believe Gamboa is not generally aware of the nature of the class claims in this case, nor have they pointed to any evidence refuting Plaintiff's assertion that she has diligently assisted counsel by sitting for her deposition and complying with written discovery requests. (ECF No. 116 at 12.)

The Court finds she has demonstrated a sufficient understanding of the class claims to serve as representative.

3.   Conflict of Interest

In January 2024, Gamboa filed an Amended Complaint asserting four retaliation claims against Evans, brought on her own behalf and on behalf of Opt-In Plaintiff Maria Hernandez. (*See* ECF No. 88.) Defendants argue these "four [] individual retaliation claims may outweigh the value of her individual wage claim," which would "create a conflict of interest" because "she may focus more on her individual claims which would negatively affect her decisions regarding the class to its members' detriment." (ECF No. 118 at 14.) The Court is unpersuaded.

"[T]he fact that a named class representative elects to pursue additional claims in

an individual capacity does not automatically give rise to a conflict." *Saucedo v. NW Mgmt. & Realty Servs., Inc.,* 290 F.R.D. 671, 683 (E.D. Wa. 2013). Thus, "[u]nless the named representative's interest in pursuing individual claims undermines his or her incentive to vigorously prosecute the class-wide claims, no conflict arises." *Id.* At this point, Defendants' assertion that Gamboa may be incentivized to prioritize her non-class claims to the detriment of the class members is purely speculative. There is, for instance, no indication of "a 'limited settlement pie' which would result in both the class and non-class claims competing for a larger share." *In re Turquoise Hill Resources Ltd. Securities Litig.,* 2022 WL 17884165 (S.D.N.Y. Dec. 23, 2022) (citations omitted).

The Court finds the Northern District of Ohio authority relied upon by Defendants distinguishable for similar reasons. *See Kurczi v. Eli Lilly & Co.,* 160 F.R.D. 667 (N.D. Ohio 1995). There, "a significant percentage, if not all, of the named plaintiffs in th[e] action [were] also bringing an identical, individual cause of action in state court." *Id.* at 678. The district court was thus concerned of "a significant risk that these plaintiffs will not adequately represent those absent class members who have not individually joined the parallel state court action" with respect, for example, to "settlement and dismissal decisions." *Id.* As far as the Court is aware, however, there is no parallel action in which Gamboa is involved that would present similar concerns here. *See also Krzesniak v. Cendant Corp.,* 2007 WL 1795703, at *10 (N.D. Cal. June 20, 2007) (distinguishing *Kurczi* on the same grounds).

Discerning no evidence that Gamboa's individual retaliation claims will impede her ability to fairly represent the class as to their common wage claims, the Court sees little reason her individual claims should preclude her from serving as class

representative at this time. *Benedict v. Hewlett-Packard Co.,* 314 F.R.D. 457, 473 (N.D. Cal. 2016) ("[A] named representative is able to represent a class while additionally bringing individual claims where there is no evidence that the individual claims will impair his ability to represent the class.")

The Court is otherwise persuaded that Gamboa and her counsel at Milstein Turner, PLLC will vigorously prosecute the action on behalf of the class. The Court will reserve its discussion of class counsel below. It thus concludes they are adequate to represent the class for purposes of Rule 23(a).

**E.    Rule 23(b)(3) Predominance**

Turning next to Rule 23(b)(3)'s requirements, the first prong requires the Court to find "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance requirement is related to, albeit 'more demanding than,' Rule 23(a)(2)'s commonality requirement." *Naylor Farms,* 923 F.3d at 789 (quoting *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (2013)). "While Rule 23(a)(2) requires only that the class share at least one common question of law or fact, Rule 23(b)(3) 'calls upon courts to give careful scrutiny to the relation between common and individual questions in a case.'" *Sherman,* 84 F.4th at 1194 (quoting *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016)). "To assess predominance, the district court must determine 'whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Id.* (internal citation omitted). "Common, aggregation-enabling issues are those that are 'susceptible to generalized, class-wide proof' or for which 'the same evidence will suffice for each

member to make a prima facie showing'; individual, aggregation-defeating issues are those for which 'members of [the] proposed class will need to present evidence that varies from member.'"  *Id.* (internal citation omitted).

Nevertheless, "[i]t is not necessary for a plaintiff to show that all of the elements of the claim entail questions of fact and law that are common to the class or that the answers to the common questions are dispositive."  *Brayman,* 83 F.4th at 838 (internal quotation marks omitted).  "[S]o long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3)—even if there remain individual issues, such as damages, that must be tried separately."  *Naylor Farms,* 923 F.3d at 789; *Tyson Foods,* 577 U.S. at 453.

"To determine which issues in the case are common and which are individual, the court must first 'consider the class's underlying cause[s] of action and determine which elements are amenable to common proof.'"  *Sherman,* 84 F.4th at 1194–95 (quoting *Menocal,* 882 F.3d at 915); *see also Black,* 69 F.4th at 1175 ("Sensibly, the predominance inquiry begins with the elements of the underlying cause of action." (internal quotation marks omitted)).  The Court must "*characterize* the issues in the case as common or not, and then *weigh* which issues predominate."  *CGC Holding Co., LLC v. Broad & Cassel,* 773 F.3d 1076, 1087 (10th Cir. 2014).

To recover under the CWCA, Plaintiff must establish that (1) "Plaintiff was an employee of defendant"; (2) "Defendant was an employer"; and (3) "Defendant failed to pay plaintiff the proper wages for all hours plaintiff worked."  *Echon v. Sackett,* 2019 WL 8275344, at *5 (D. Colo. Feb. 12, 2019).  The CMWA requires that "[n]on-exempt employees must be paid time and one-half their regular rate of pay for all hours worked

in excess of 40 hours per week or 12 per day." *Allsopp v. Akiyama, Inc.,* 2010 WL
1258006, at *2 (D. Colo. Mar. 26, 2010). Thus, Plaintiff must also show that she worked
in excess of 40 hours per week and was not compensated time and one-half of her
regular rate of pay.

Whether Plaintiff and the putative class members were employees or
independent contractors is a common question which will turn primarily on evidence of
"the degree of control" Defendants exercised over them. C.R.S. § 8-4-101(5). While
the day-to-day experiences of the putative class members will invariably differ, it
appears the degree of control exercised by Defendants will be substantially informed by
common proof. To reiterate, there is no dispute that Defendants classified *all* the
putative class members as independent contractors. Moreover, all of the putative class
members were subject to the same Standard Operating Procedures (ECF No. 60) and
received substantially similar training (*e.g.,* ECF No. 116-11). The putative class
members' testimony supports the contention that Defendants exercised similar control
over their schedules via WhatsApp, including their start and stop times and when they
could take rest and lunch breaks. (ECF No. 116 at 7 (collecting testimony); ECF No.
116-7 (sample WhatsApp message).) Plaintiff further asserts they were supervised by
the same individuals (ECF No. 124 at 10) and they performed all of their work on
manufacturing equipment provided by Defendants (ECF No. 116 at 9).

To the extent the fact finder determines the putative class members are
employees, the question of whether they were unlawfully denied overtime pay will
similarly be subject to common proof. Again, there is no dispute that Defendants did not
pay overtime wages to *any* workers classified as independent contractors. (ECF No.

116-5 (KISS Rule 30(b)(6) Dep.) at 64:1–17.)  Moreover, all were paid hourly at rates

set by Defendants, as reflected in KISS's payroll records.  (*E.g.,* ECF No. 116-6; *see*

*also* ECF No. 116-5 (KISS Rule 30(b)(6) Dep.) at 105:14–106:2.)  Whether the putative

class members were unlawfully denied overtime pay can thus be largely—if not

entirely—resolved by reference to KISS's payroll records, should Defendants be found

liable for misclassifying their employees.  While the number of hours worked by the

putative class members will necessarily vary week-to-week, courts have routinely held

that "[t]he issue of individualized hours worked is commonplace in wage-and-hour class

actions, and it does not overwhelm the shared questions regarding misclassification of

[workers] as exempt from overtime payment."  *Deakin v. Magellan Health, Inc.,* 2024

WL 3829737, at *7 (D.N.M. Aug. 14, 2024); *see also Felps,* 336 F.R.D. at 677 (holding

that courts routinely and roundly reject the notion that the issue of individual hours

worked necessarily predominates over common misclassification questions); *Pruess,*

745 F. Supp. 3d at 1243.

Still, Defendants argue that "a class premised on hours worked is subject to

individual, daily inquiries" because the determination of which employees *actually*

worked overtime will be obfuscated by (1) asserted instances of timesheet fraud and

(2) the fact that "timekeeping methods . . . were conflicting, different, or changed over

time."  (ECF No. 118 at 6–8.)  The Court is unpersuaded that either of these

considerations injects individualized questions into the litigation that will predominate

over questions common to the class.

The first issue relates in part to Gamboa's purported admission that "she herself

reported more hours on her timesheet than she had actually worked," which the Court

has already addressed and will not revisit.  (*Id.* at 7.)  However, Gamboa also testified at

deposition "that a supervisor at KISS would inflate hours for potential class members in

the supervisor's 'inner circle, even if they didn't work.'"  (*Id.* (quoting ECF No. 118-2

(Gamboa Dep.) at 77:22–79:18, 140:5-142:21).)  As a result, Defendants contend

individualized inquiries will be required to determine "whether hours were reported

properly."  (ECF No. 118 at 7–8.)

The scope of this alleged artificial inflation of hours, however, appears limited.

The record supports that a mere five individuals were involved in this alleged incident of

timesheet inflation, the identities of whom Defendants appear to be well-aware.  Indeed,

Defendant Evans has pressed criminal charges against each of them for wage theft.

(*See* ECF No. 124-1 (KISS Rule 30(b)(6) Dep.) at 59:3–60: ("Q: How many people who

worked for you do you intend to press criminal charges against? / A: I believe it's five. . .

.Q: When do you intend to contact law enforcement on these charges? / A: We've

already commenced that. . . . Q: What did you tell the police? / A: People are having

wage theft from my business.").)  Thus, to the extent particularized inquiries into the

accuracy of any timesheets is necessary, it will be limited to those five individuals'

timesheets.

Defendants next argue that the inquiry into whether the class members worked

"overtime hours" will necessarily be individualized based on the putative class members'

testimony that "timekeeping methods within the inventory and production departments

were conflicting, different, or changed over time."  (ECF No. 118 at 8.)  But, based on

the Court's review of the cited testimony, all of the proposed class members testified

that either a supervisor recorded their entry and exit times, or they self-recorded their

entry and exit times.  (*See, e.g.,* ECF No. 118-2 (Gamboa Dep.) at 35:3–6 (testifying

that "in production, the supervisor was writing the entry hour and the exit hour of each

worker" and in "inventory, . . . each of us recorded entry and exit time"); ECF No. 118-3

(Hernandez Dep.) at 77:2–7 (testifying "Mr. Antonio would write down the time that [she]

came in and the time that [she] left").)  The Court fails to see why this means "each time

record would need to be litigated to verify whether individuals or their supervisors

accurately reported hours or inflated them."  (ECF No. 188 at 8.)  Defendants effectively

ask the Court not to "hold [KISS] to its own records," which would "amount to excusing it

from its record-keeping duty" under Colorado law.  *Williams v. Sweet Home Healthcare,*

*LLC,* 325 F.R.D. 113, 129 (E.D. Pa. 2018); COMPS #38, § 7.1 ("Every employer shall

keep . . . a true and accurate record for each employee which contains . . . [a] daily

record of all hours worked."); *see also Barragan v. Home Depot U.S.A., Inc.,* 2022 WL

174023, at *6 (S.D. Cal. Jan. 18, 2022) ("Defendant may not rely upon the inaccurate

information in its own records as a basis for denying class certification.").

The Court thus finds that the questions of law or fact common to class members

predominate over any questions affecting only individual members.

**F.    Rule 23(b)(3) Superiority**

Finally, the Court must determine whether "a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

23(b)(3).  Rule 23(b)(3) advises that "matters pertinent to" this finding include (1) "the

class members' interests in individually controlling the prosecution or defense of

separate actions"; (2) "the extent and nature of any litigation concerning the controversy

already begun by or against class members"; (3) "the desirability or undesirability of

concentrating the litigation of the claims in the particular forum"; and (4) "the likely

difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(A)–(D).  "Class status is

appropriate as long as plaintiffs can establish an aggregation of legal and factual issues,

the uniform treatment of which is superior to ordinary one-on-one litigation."  *CGC*

*Holding,* 773 F.3d at 1086.

Plaintiff submits that, given "[her] claims and those of the class arise from the

same legal grievances" and the common question of "whether Defendants'

misclassifications of its workers violated the law will be litigated repetitively if the[ir]

claims are not aggregated" (ECF No. 116 at 13), a class action is the superior method

for adjudicating the state and local overtime claims "[i]n terms of efficiency for the

parties and for the court," *Bass v. PJCOMN Acquisition Corp.,* 2011 WL 2149602, at *3–

4 (D. Colo. June 1, 2011).  She also contends that "concentration of claims here is

desirable as all Defendants reside in and all claims arose in this judicial district."  (ECF

No. 116 at 13.)  Moreover, Plaintiff points out that courts in this District have found a

class action to be a superior method "where the small claims of parties with limited

resources are otherwise unlikely to be pursued," as is the case here.  (*Id.* at 13–14); *see*

*Stanley v. Orthopedics & Spine Center, P.C.,* 2024 WL 1743497, at *6 (D. Colo. Apr. 23,

2024) ("the court deems a class action a superior method for adjudicating the relatively

small claims of low-wage workers"); *Hunter v. CC Gaming, LLC,* 2020 WL 13444205, at

*4 (D. Colo. May 12, 2020) ("courts in this District have repeatedly recognized . . . a

class action is superior where the small claims of parties with limited resources are

otherwise unlikely to be pursued").  Particularly in view of its findings as to

ascertainability, commonality, and predominance herein, the Court agrees that these

considerations weigh in favor of finding a class action is the superior method for

adjudicating Plaintiff and the proposed class members' state and local wage claims.

Plaintiff also asserts a class action is superior because "the absent class

members have shown no interest in controlling the litigation of separate actions."  (ECF

No. 116 at 13.)  However, Defendants argue the inverse is also true.  (ECF No. 118 at

9–12.)  That is, the lack of participation in the FLSA collective action demonstrates "a

total disinterest among putative class members to pursue these state law claims on a

classwide basis," which weighs against certifying a class action.  (*Id.* at 10.)

Defendants direct the Court to two authorities—*Garcia v. Freedom Mortg. Corp.,*

274 F.R.D. 513 (D.N.J. 2011) and *White v. 14051 Manchester Inc.,* 301 F.R.D. 368

(E.D. Mo. 2014)—to support their position.  (ECF No. 118 at 10.)  In *Garcia,* the district

court concluded that, given "less than 44% of the putative loan officer class and less

than 17% of the putative loan processor class" opted into the FLSA litigation, it was

"clear that a large number of such putative class members have an interest in the

individual control of the prosecution of their FLSA claims."  274 F.R.D. at 517.  The

court in turn reasoned it was "unfair to certify" a class on the substantively identical state

law claims "and drag the putative class members into this Court when they have already

demonstrated an interest not to be involved."  *Id.*  Similarly, in *White,* the district court

observed that of the "nearly 800 Court-approved notices of the collective action"

distributed to the servers and bartenders comprising the potential collective, "less than

10% of the envelopes sent resulted in putative class members consenting to join the

FLSA action."  301 F.R.D. at 383–84.  It thus "discern[ed] that at least some members of

the putative class do not support the class resolution of the state wage and hour claims

and would prefer individual claims or not to pursue claims."  *Id.* (favorably citing *Garcia*).

However, as Plaintiff aptly points out in reply, the *Garcia* court noted "the absence of allegations or evidence of improper behavior towards the class members." 274 F.R.D. at 517.  Defendants respond that "[t]here is no allegation of improper behavior toward class members."  (ECF No. 118 at 11.)  But the record before the Court indicates otherwise.

For instance:

- Gamboa alleges that: "On May 13, 2022, three days after being served with the original Complaint, [] Evans instructed one of his employees to contact [] Gamboa and to tell her that he knew where she lived, he knew who her new employer was, he knew what kind of car she drove, that he could have [] Gamboa jailed and deported, and that she should drop her lawsuit against him."  (ECF No. 88 at ¶ 30.)

- As discussed, Evans testified at deposition in February 2023—before conditional certification of the FLSA collective action—that KISS had pressed criminal charges against five workers for alleged wage theft "[t]hree, four weeks ago."  (ECF No. 124-1 (KISS Rule 30(b)(6) Dep.) at 59:3–60:15.0.)

- In October 2023—during the FLSA collective action opt-in period—Denver Labor opened an "investigation to determine whether KISS, Mr. Evans, and an unknown number of John/Jane Does had engaged in unlawful retaliatory behavior" against KISS workers.  (ECF No. 124-6 at 3.)

- Although the January 2024 Event discussed at length in a prior Order (ECF No. 115) occurred after the FLSA collective action opt-in period had already closed, KISS workers conveyed to a volunteer attorney present that "they were not surprised Mr. Cole had shown up because that is the way he is, and the way they were used to being treated by him."  (ECF No. 99-5 (Jenks Decl.) at ¶ 16.)

In marshaling these examples, the Court expresses no opinion on the merits of Gamboa and Opt-In Plaintiff Hernandez's individual retaliation claims, which Evans will have an opportunity to refute through the course of this litigation.  However, for the purposes of class certification, they are more than sufficient to persuade the Court it

should not assume the class members have no interest in pursuing their overtime claims based on their lack of participation in the FLSA action.  *See Ganci v. MBF Inspection Servs., Inc.,* 323 F.R.D. 249, 265 (S.D. Ohio 2017) ("Given the inherent fear of employer retaliation involved in wage and hour claims, it is not reasonable to assume" the opt-in plaintiffs comprise the whole that "wish to pursue a claim for unpaid wages," as "many employees may choose not to join the FLSA collective action not because they believe they are not aggrieved, but because they wish to preserve the relationship with their employer."); *Guzman v. VLM, Inc.,* 2008 WL 597186, at *8 (E.D.N.Y. Mar. 2, 2008) (reasoning "[t]he FLSA's opt-in procedure is simply not an equivalent stand-in for a class action" in view of the "valid concern" "that many employees will be reluctant to participate in the [FLSA] action due to fears of retaliation"); *Noble v. 93 Univ. Place Corp.,* 224 F.R.D. 330, 346 (S.D.N.Y. 2004) (superiority requirement satisfied where there "is reason to believe that class members may fear reprisal and lack familiarity with the legal system, discouraging them from pursuing individual claims").

The Court thus finds a class action is the superior method for resolving Plaintiff and the putative class members' wage claims arising under state and local law.  And, having now found all requisites of Rule 23(a) and Rule 23(b)(3) to be satisfied, the Court concludes Plaintiff's request for certification of a Rule 23 class should be granted.

## G.    Appointment of Counsel

Under Rule 23(g), "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g).  In so doing, the Court "*must* consider"

        (i)    the work counsel has done in identifying or investigating

potential claims in the action;

(ii)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

(iii)    counsel's knowledge of the applicable law; and

(iv)    the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A) (emphasis added).

Plaintiff's counsel Andrew H. Turner and Brandt Milstein of Milstein Turner, PLLC seek appointment as class counsel.  (ECF No. 116 at 12.)  They state that, together, they "have worked more than 419 hours on the instant class action" and "will continue to dedicate all necessary resources to bring this case to its conclusion."  (*Id.; see also* ECF No. 116-8 (Milstein Decl.) at ¶ 11; ECF No. 116-13 (Turner Decl.) at ¶ 11.)  They submit they "are very experienced in complex class wage litigation and have consistently been appointed Class Counsel in class actions in this District and elsewhere."  (ECF No. 116 at 12; *see also* ECF No. 116-8 (Milstein Decl.) at ¶ 10 (citing six cases in which he has been appointed class counsel); ECF No. 116-13 (Turner Decl.) at ¶¶ 6–9 (describing experience litigating labor standards cases since prior to January 2005 and citing fifteen cases in which he has been appointed class counsel).)  Based on the foregoing, the Court readily finds that Mr. Turner and Mr. Milstein satisfy Rule 23(g)(1)(A)'s requirements.

Nevertheless, the Court also "*may* consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  Fed. R. Civ. P. 23(g)(1)(B) (emphasis added).  And here, Defendants argue "proposed class counsel cannot adequately represent the class's interest given counsels' unique

personal involvement with, and knowledge of, the facts surrounding [Opt-In Plaintiff]

Hernandez's four [] retaliation claims."  (ECF No. 118 at 15.)  Specifically, they assert

proposed class counsel's involvement in the January 2024 Event implicates Colorado

Rule of Professional Conduct 3.7(a), which states:

> A lawyer shall not act as advocate at a trial in which the
> lawyer is likely to be a necessary witness unless:
>
> > (1) The testimony relates to an uncontested issue;
> >
> > (2) The testimony relates to the nature and value of legal
> > services rendered in the case; or
> >
> > (3) Disqualification of the lawyer would work substantial
> > hardship on the client.

Colo. R. Prof'l Cond. 3.7(a).

The Court is unconvinced.  Even to the extent that proposed class counsel has

personal knowledge of the events partially forming the basis for Gamboa and Opt-In

Plaintiff Hernandez's retaliation claims, Defendants do not argue that Milstein and

Turner are *necessary* witnesses.  For the purposes of Rule 3.7(a), "a lawyer is a

'necessary' witness if his or her testimony is relevant, material and unobtainable

elsewhere."  *World Youth Day, Inc. v. Famous Artists Merchandising Exchange, Inc.,*

866 F. Supp. 1297, 1302 (D. Colo. 1994).  The Colorado Supreme Court has directed

that a trial court should consider, among other things, "the availability of other witnesses

or documentary evidence which might independently establish the relevant issues."

*Fognani v. Young,* 115 P.3d 1268, 1274 (Colo. 2005) (citation omitted).

In previously denying Defendants' efforts to depose Plaintiff's counsel about the

January 2024 Event, the Court explained that it was "wholly unpersuaded" Defendants

possessed no other means to obtain the information sought.  (ECF No. 115 at 12.)

Defendants have still made no effort to explain why such alternative sources of information about the January 2024 Event are unavailable or else insufficient. From this the Court concludes that Plaintiff's counsel's testimony is not necessary within the meaning of Rule 3.7(a) with respect to the prosecution of the referenced retaliation claims.

Accordingly, the Court finds that Plaintiff's counsel at Milstein Turner, PLLC will "fairly and adequately represent the interests of the class" and their request to be appointed class counsel is granted. Fed. R. Civ. P. 23(g)(4).

**H.    Proposed Class Notice**

Finally, Plaintiff asks the Court to approve the proposed notice to the class substantially in the form attached as Exhibit 15 to the Motion. (ECF No. 116-14). Plaintiff states that, once approved, she will "secure a certified translation of this notice in Spanish," which will then "be distributed . . . by first-class mail and via text message to all identified class members." (ECF No. 116 at 14.)

Plaintiff's plan of distribution facially complies with Rule 23(c), which simply states "[t]he notice may be by one or more" methods including "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B). However, given the questions raised here as to whether KISS's personnel records contain accurate information, the Court is of the view that more detail would aid in its determination of whether the proposed plan of distribution is "the best notice that is practicable under the circumstances." *Id.*

Accordingly, the Court reserves ruling on Plaintiff's proposed plan for the distribution of the class notice pending Plaintiff's filing of a supplemental motion in which

she provides additional information on her proposed plan of distribution, as further directed below. Plaintiff may refer to *Green v. Perry's Restaurants LTD,* Civil Action No. 21-cv-0023-WJM-NRN (ECF Nos. 216, 217) and *Stender v. Archstone-Smith Operating Trust,* Civil Action No. 07-cv-2503-WJM-MJW (ECF No. 468) as exemplars. To the extent Defendants oppose the relief requested in such supplemental motion, they will be given an opportunity to respond to same.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      The Renewed Motion for Class Certification (ECF No. 116) is GRANTED;

2.      The Court CERTIFIES a Rule 23 class as to Plaintiff's wage claims arising under state and local law defined as: "All production, inventory and shipping workers who worked overtime hours and who were not paid overtime wages between May 9, 2019 and the present.";

3.      Pursuant to Rule 23(g), the Court APPOINTS Plaintiff's counsel at Milstein Turner, PLLC as class counsel; and

4.      Plaintiff is DIRECTED to file a supplemental motion setting forth in greater detail her proposed plan for distribution of the class notice by no later than **April 14, 2025**.

Dated this 2nd day of April, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge